UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X

UNITED STATES OF AMERICA,

Dkt. No. 18-CR-530

     v.

CHRISTOPHER MCCOY,

                Defendant.

-----------------------------------------------------X

**<u>SENTENCING MEMORANDUM</u>**

Edward V. Sapone, Esq.
Chase S. Ruddy, Esq.
Sapone & Petrillo, LLP
*Attorneys for Defendant*
*Christopher McCoy*
One Penn Plaza, Suite 5315
New York, New York 10119
Telephone: (212) 349-9000
E-mail: ed@saponepetrillo.com

# TABLE OF CONTENTS

Page

I.    Introduction ...................................................................................................1

II.   History & Characteristics of Mr. McCoy and the Nature &
      Circumstances of the Offense (§3553(a)(1)) ................................................1

      a.    *Mr. McCoy's History & Characteristics* ...........................................1

      b.    *Nature and Circumstances of the Offense* .......................................11

III.  Remaining Factors of 18 U.S.C. §3553(a) .................................................12

      a.    *The Need for the Sentence Imposed to Reflect the Seriousness
            of the Offense, to Promote Respect for the Law, to Provide
            Just Punishment for the Offense, and to Avoid Unwarranted
            Sentence Disparities* .......................................................................12

      b.    *General & Specific Deterrence* ......................................................14

IV.   Conclusion ..................................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

**Statutes**

18 U.S.C. §242.................................................................................................................1

18 U.S.C. §3553(a) ............................................................................... *passim*

28 U.S.C. § 994(j).............................................................................................16

**Other Authorities**

Andrew von Hirsch, Anthony Bottoms, Elizabeth Burney, and P-O. Wikstrom,
    "Criminal Deterrence and Sentence Severity: An Analysis of Recent Research,"
    Oxford: Hart Publishing (1999) ..............................................................14

David Weisburd et al., *Specific Deterrence in a Sample of Offenders*
    *Convicted of White-Collar Crimes*, 33Criminology 587 (1995) ...........................................15

Donald P. Green & Daniel Winik, *Using Random Judge Assignments*
    *to Estimate the Effects of Incarceration and Probation on Recidivism*
    *among Drug Offenders*, 48 Criminology 357 (2010) .............................................15

Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice:
    A Review of Research 28-29 (2006) .......................................................14

*Recidivism and the 'First Offender'': A component of the Fifteen Year*
    *Report on the U.S. Sentencing Commission's Legislative Mandate*,
    United States Sentencing Commission, May 2004..........................................16, 17

Steven N. Durlauf & Daniel S. Negin, *Imprisonment and Crime:*
    *Can Both be Reduced?,* 10 Criminology & Pub. Pol'y 13, 37 (2011) ....................................14

Valerie Wright, Ph.D., *Deterrence in Criminal Justice: Evaluating Certainty v. Severity of*
    *Punishment*, The Sentencing Project (November 2010) *available at*
    http://www.sentencingproject.org/doc/Deterrence% 20Briefing% 20.pdf............................15

## I.       Introduction

Defendant Christopher McCoy is scheduled for sentencing on July 18, 2019, at 11:30 a.m. I offer this memorandum to provide the Court with important information as it considers the factors of 18 U.S.C. §3553(a).

At the outset, we want the Court to know that Mr. McCoy recognizes how serious his offense is and that he has no one to blame but himself. He formally accepted responsibility on October 9, 2018, to a one-count misdemeanor Information (18-CR-530), charging him with Deprivation of Civil Rights, in violation of 18 U.S.C. §242.

Mr. McCoy has learned a very difficult and valuable lesson. He is riddled with regret over his actions and desires to live the rest of his life as a positive and contributing member of the community who works hard, devotes his time to his family and friends and helps support his wife and his three young children. He is someone who, despite his error in judgment, otherwise served the community as a police officer without incident for more than 10 years, and has been an outstanding father who shares a very close and special bond with his children. As the Court considers the whole person whom it will sentence, we wish to highlight for the Court the unique facts and circumstances of Mr. McCoy's life.

## II.      History & Characteristics of Mr. McCoy and the
##          Nature & Circumstances of the Offense (§ 3553(a)(1))

*a.      Mr. McCoy's History & Characteristics*

Mr. McCoy is 40 years of age. He was born and raised in Seaford, and is the third of five children born to his parents, Joseph and Susan. Service and community have always been cornerstones in his family's household. Mr. McCoy' father served in the United States Army,

reaching the very impressive rank of Lieutenant Colonel. At an early age, values of generosity and kindness were instilled in Mr. McCoy.

Mr. McCoy was a well-rounded young man who excelled academically and athletically. In elementary school, he was a member of the student government, band, drama club and AV club. While in the fifth grade, he achieved the *Arrow of Light*, the highest award in Cub Scouts, marking a milestone in a scout's growth.

In middle school, he secured his first job as a newspaper delivery boy. By the age of 16, he was working as an emergency telephone operator at Medfone Nationwide, Inc. He was on the high school football team, and was chosen as the captain during his senior year. He was a member of the *National Honor Society* and was the vice president of his senior class. He graduated high school with honors and a Regents diploma.

One of Mr. McCoy's classmates, Michael Tufo, who continues to admire Mr. McCoy, writes: "Chris always stood up for the kids who were bullied and protected those who could not protect themselves. […] This is simply who Chris is at his core." (Exhibit A). Timothy Leary, another classmate, shares: "[H]e believed in helping others and getting all people involved. […] Chris would always go the extra mile to get kids involved and stick up for those when people tried to poke fun at them. As a teammate he would always put the team before the individual. […] Helping others was something that came natural to Chris." (Exhibit B).

Although he had never been away from home, Mr. McCoy chose to attend Clemson University, in South Carolina. He majored in financial management. In the spring of his sophomore year, he decided to try out for the varsity football team, one of the perennial powers in national college football. At the end of spring practices, he earned a spot as a walk-on on the scout team.

Mr. McCoy's older brother, Joe, recalls Mr. McCoy's time on the football team at Clemson as a prime example of his "uncanny selflessness." "He was a scout player, routinely getting beat up in practice by scholarship players twice his size. His role was to help the starters prepare for the game by learning and playing with the opponent's defense. He had no delusions of being a star, or even getting on the field. In fact, dressing for a home game was a big deal. He gave everything he had to help his team become successful, with no promise of glory.[…]" (Exhibit C).

Mr. McCoy's sister-in-law, Heather, who met him when he was a junior at Clemson, similarly reflects: "I was immediately impressed by his maturity and responsibility […]. Chris was a thoughtful student – self-motivated to succeed in school and as a student-athlete. […] I believe he only dressed for one game the entire four years that he was on the team. But, this did not bother Chris; I never heard him complain. He was honored to be a part of the team and he took his role seriously – his work ethic, dedication and humility was evident to his coaches and to his family." (Exhibit D).

Mr. McCoy was often beaten up physically and mentally, and struggled to balance the incredible demands placed on him by his studies and sports. Nonetheless, he spent two years as a member of the team, which in his senior season placed third in the Atlantic Coast Conference, and was selected to play in the 1999 Peach Bowl.

He graduated from Clemson in August of 2000 with a degree in financial management. He was offered a promotion to account manager at Medfone Nationwide, Inc., and held that position for four-and-a-half years. He was well respected by both his clients and colleagues.

According to Dawn McCoy, one of Mr. McCoy's sisters-in-law, who worked with him at Medfone: "Due to his work ethic and commitment to the company, he moved up to management

after returning from college at Clemson University. He always showed dedication to his job and coworkers and had a great rapport with his clients." (Exhibit E).

Ryan Berg writes: "From a professional perspective Chris was a mentor to me. I was in a position that worked closely with Chris when he was an account Manager for Medfone. […] He was always honest and forthright, and always took responsibility for his own actions. When he left Medfone for the NYPD, I was promoted into his position as Account Manager and when I first met with his former clients, they expressed to me their sincere appreciation of the job that Chris did in servicing them, on each and every occasion." (Exhibit F).

This is echoed by Robert Laguerre, who served as Mr. McCoy's supervisor at Medfone:

> His work ethic was second to none and he treated his coworkers and clients with the utmost respect. He showed up to work early on most occasions and rarely called out sick. His positive attitude, integrity, and dedication fit in well with our corporate culture. Chris was well liked by everyone. When Chris made the decision to leave MEDFONE to pursue a career in law enforcement I knew finding a replacement would be difficult. He was a true asset to the organization in many ways.

(Exhibit G).

Despite his success, Mr. McCoy felt he lacked a sense of purpose. He felt drawn to serve the public as his father had as a member of the U.S. armed forces; so he chose to pursue a career in law enforcement. In January 2005, Mr. McCoy entered the New York City Police Academy. Upon graduating from the police academy, he was assigned to the 102nd police precinct in Richmond Hills, Queens. From the moment he worked his first command post he was recognized for his dedication to the job, deep respect and compassion for the people of the communities he served.

One of Mr. McCoy's teammates on the NYPD football team, Shan France, who also worked with him in the 102, writes: "Chris was always courteous, professional and respectful to

the community in which we patrolled." (Exhibit H). This is echoed by fellow NYPD member Joseph Lomangino: "Chris is an exemplary police officer who has excelled during his career as a police officer and he has never been in any kind of trouble. Chris was not only an excellent officer but also served as someone to look up to for newer police officers." (Exhibit I).

During his time at the 102nd precinct, Mr. McCoy was partnered with Heather Fliedner. The two grew close quickly, and in 2007, he and Heather became engaged. In July 2009, they married.

In September 2007, Mr. McCoy left the NYPD to join the Suffolk County Police Department. He was assigned to the 1st precinct in West Babylon. According to Marc Denker, who knows Mr. McCoy through his father Joseph: "When the opportunity arose to work closer to his community on Long Island, Chris jumped at it; being closer to the community he lived in and his family filled him with pride and boundless energy. He undertook every opportunity to make his family and communities lives better without hesitation; it is what he lives for." (Exhibit J).

In approximately 10 years as a member of the SCPD, Mr. McCoy made more than 250 arrests, including arrests for gun possession, bank robbery, assault and drug possession. During his time with the SCPD, he received at least three department or command recognition awards for his arrests. In July 2016, he was assigned to the Community Support Unit, an important step towards becoming a detective. Mr. McCoy loved serving the community. He loved being a cop, and according to the letters from many community members and his peers in the department, he was a good one.

According to a man who has known Mr. McCoy for 25 years, Doug Newhook: "Chris wanted to keep his neighborhoods safe and secure. He loves his role as a police officer and loves being someone that can keep others safe and serve his community." (Exhibit K). This is echoed

by James Conklin, who writes: "As long as I've known Chris, I've known him to be a man of integrity, compassion, and morality. […] Chris is someone that has taken pride in keeping the people of Suffolk County safe from harm. This profession in law enforcement was a natural fit for someone like him who constantly seeks to do good for his community." (Exhibit L).

Michael Pisapia, an attorney for 26 years, and former Queens ADA, shares: "I have met Chris on numerous occasions and he evinces a deep love and commitment for policing." (Exhibit M). His wife, Melissa Pisapia, similarly shares: "Chris has spoken to me of his love for his career as a police officer […]. Chris especially takes pride in his role in making the community in which he works safer and enriching the lives of its residents." (Exhibit N).

John Whidden, who has known Mr. McCoy for more than 30 years, and who is himself a 15-year veteran of the Suffolk County P.D., shares his observations: "I had the privilege of working alongside [Chris] for 5 years. In that time, I observed him working in all aspects of our job from routine patrol, neighbor disputes, traffic stops, community events and arrests. At no point have I ever witnessed Christopher McCoy act in any way but professional while on duty. Although I left the precinct in 2012, […] Chris's co-workers and supervisors would continually tell me how well he was doing at work and what a positive influence he was for the new officers." (Exhibit O).

Andrew Hope, who knew Mr. McCoy on the job for seven years, and served as his partner, writes: "In our line of work, partners do everything together and literally spend every minute of the day together. During our years together, I have only seen Chris handle himself with integrity and trustworthiness." (Exhibit P).

Anthony Russo, who met Mr. McCoy in 2007 when he was assigned to the 1st precinct, and who has been a member of the Suffolk County Police Department for 12 years, shares: "I

worked with Chris on patrol and observed him to be an exemplary police officer who was always professional and dedicated to his duties. Chris is not only an excellent officer but also serves as role model for newer police officers." (Exhibit Q).

Police Officer Anthony Mennella, who worked with Mr. McCoy for six years in the SCPD, writes: "Chris has always demonstrated professionalism and a positive attitude when interacting with the public and fellow co-workers. Chris is a hard worker and has an impeccable reputation among his peers." (Exhibit R).

Patricia Torres, who worked with Mr. McCoy as a police officer for 10 years shares: "Chris is a hardworking, caring and trustworthy person who treated people with empathy and respect regardless of the situation or the circumstances that surrounded it. Chris has only ever demonstrated being a man of good moral character, honest and very compassionate." (Exhibit S).

Mr. Maldonado, who has known Mr. McCoy for more than 10 years, working as his partner for some of that time, writes: "When I worked with Chris he was a dedicated and honest police officer. He always handled things professionally. As my partner I knew we were safe together no matter what was going on. Chris never lost control of any situation when we were together. I still to this day have faith in Chris and trust him." (Exhibit T).

And Danny Burnside, who worked with Chris as a member of SCPD beginning in 2007, shares: "I was fortunate enough to have worked side by side with Chris on multiple occasions. I had the opportunity [to] work closely with him in many different situations ranging from 911 calls for police service to arrest situations. Chris has always treated people fairly and with respect. I would consider Chris to be a professional, effective, hard working Police Officer." (Exhibit U).

In addition to his history as a dedicated police officer, Mr. McCoy has also shown that he is a devoted father. Heather and Mr. McCoy welcomed their first child, C██████ in 2010. Two years later, a second son, L███, was born. And in 2014, the couple's third child, a daughter, E███, was born.

Mr. McCoy has always been very involved in all three children's lives. He chaperones class field trips, helps with classroom projects and parties, and has volunteered to read to the kids' classes at school. He also has coached C██████'s and L███'s T-ball and Little League Baseball teams, not because of his knowledge of the game, but because he likes sharing the experience with them. On school days he packs the kids' lunches and draws them each a picture to remind them of something funny that happened at home or something they enjoy seeing. And every day he and the kids do a special "high five" routine before he leaves for work.

According to Mr. McCoy's sister-in-law: "I saw the strength of Chris' character when he became a father. […] Chris amazes me with the patience, compassion, and wisdom he brings to fatherhood. I have watched him lovingly ease a child's anxiety, comfort a teary toddler, and calm a room full of energetic "superheroes," more times than I can count. Chris's children would be lost without their dad." (Exhibit D).

Mr. McCoy's brother-in-law describes him as "one of the most devoted and involved fathers I know and [he] does everything for his three children." (Exhibit U). His mother-in-law, Sandra Fliedner, writes: "Saying Chris is an amazing father is truly an understatement." (Exhibit V). According to his childhood friend Timothy Leary: "He always 'lights up' when discussing his kid's accomplishments or remembering something funny they did that made his day. Chris is thoughtful, caring and well-mannered. You can see the same characteristics in his children as they have learned these traits from their loving father." (Exhibit B).

Mr. McCoy's younger sister, Kaitlyn, shares similar observations of him as a father:

> The love he showed for his son on that first day and every day since is special and something that everyone should hope to see in a dad. When his second son and daughter were born, it was clear to anyone who saw them together that they brought so much more love and joy to his life. He has been involved in every aspect of their lives from day one. My brother changes diapers, cooks meals, makes them their favorite banana bread, volunteers to coach their baseball teams and does anything else he can to ensure their happiness. He is a good dad and his children are fortunate to have him in their lives.

(Exhibit V).

His oldest brother, Joe, writes: "There is no other person in the world that I would trust more with my own kids than Chris. […] Chris is a thoughtful person who his family relies on in tough situations and he always comes through for us." (Exhibit C).

His older brother, Brian, similarly shares:

> He is always ready and willing to help, most times without even having to ask. Chris is a very caring and responsible person. […] My brother is also an amazing father and loving husband who would do anything for his family. He is caring and compassionate and is involved in every aspect of all 3 of his children's lives. His children mean the world to him and they would be completely lost without their father.

(Exhibit W).

And his younger brother, David, writes:

> His work ethic, dedication, courage and resiliency have been exemplary traits that I can only hope get passed to the next generation of McCoys. […] Chris has always been one to help at anytime when needed. When I moved into my new home, Chris was there to help. When I was down and not in the best mood, Chris always went out of his way to bring a smile to my face. I couldn't have asked to grow up with a better brother.

(Exhibit X).

Jennifer Hock, who has known Mr. McCoy for over a decade, shares: "I have come to know how deeply he cares for his family, his friends and his dedication to his job of serving and protecting on the police force. He is tirelessly hardworking […]. He is a loving father […]. He […] is always willing to lend a helping hand. He is dependable, kind and levelheaded." (Exhibit Y).

Mr. McCoy is kind, compassionate and loyal. Shan France, who worked with him at the NYPD, recalls how Mr. McCoy's friendship extended beyond the job, especially in difficult times: "[W]hen my wife passed away in February of 2009, he was instrumental in keeping my faith and strength up in this dark [] time. He has taught me what it is to value a friendship; he stepped up without hesitation, he comforted me and my children during this time. […] I believe Chris is a great man, an awesome, supportive friend and he has been there for me and my family without hesitation." (Exhibit H).

According to Matthew DeRiso, a friend of Mr. McCoy's for more than 20 years: "He never has a bad word to say about anyone, and his kindness and generosity are unparalleled." (Exhibit Z). Bill Schwenk, who has known Mr. McCoy for more than 30 years, has "always known Chris to be a loyal friend, dependable, responsible, and honest." (Exhibit AA). Robert Romano describes Mr. McCoy as a "great friend who would give his own shirt right off his back if you needed it. […] He is the type of guy that would drop anything he was doing to come give you a hand if you needed." (Exhibit BB). Christian Baldwin, who has known Mr. McCoy since they were roommates at Clemson 20 years ago, writes: "In every endeavor Chris has taken on, he has always conducted himself with integrity and honesty, is unselfish in putting others first, and fully commits himself to the task at hand. Chris is genuinely well-liked by everyone he meets and has a very approachable personality." (Exhibit CC).

The nearly **50** letters written each tell a similar story: Mr. McCoy is a man who has devoted his life to family and community. He has shown himself to be especially dependable when people have no one else to turn to for a favor. The examples are countless of Mr. McCoy's generosity of spirit and kind and compassionate nature. They show that he is at heart a good and caring man who strives to help others, and asks for nothing in return.

b.      *Nature & Circumstances of the Offense*

As he approaches his sentencing, Mr. McCoy continues to accept responsibility.

Licensed Clinical Social Worker Mark Williams, and Board Certified Psychiatrist John Docherty, M.D., each of whom had spent time interviewing Mr. McCoy, explain how his history and characteristics, including his obsessive compulsive and impulse-control disorders, had contributed to his commission of the instant offense.

According to Mark Williams, LCSW:

> It is clear from my comprehensive interviewing of Chris that he suffers from an excessive impulse control disorder which primarily manifests itself by his history of acting out sexually. People who suffer from impulse control disorders cannot avoid doing things that might bring harm to themselves or others. […] In Chris's case, [] the lack of intimacy at home and the complainant's flirtatious behavior on the day in question, led Chris to disregard his better judgment and act on impulse.

(Exhibit DD).

Dr. Docherty further discusses the confluence of Mr. McCoy's psychiatric disorders and the circumstantial factors that contributed to his having engaged in the instant offense:

> [I]t is my medical opinion that the following five factors all have a role in both understanding and contributing significantly to the behavior of the instant offense: (1) Mr. McCoy's pro-social but moralistic upbringing, (2) Mr. McCoy's orientation in life toward self-sacrifice and service to others, (3) the presence of psychiatric disorders (a) Obsessive-Compulsive Disorder and Obsessive-

Compulsive Personality Disorder, (4) the stress of [] a deteriorating marital relationship and then of a change in police force partner, all leading to (5) progressive psychological decompensation marked by the emergence of the psychiatric diagnosis of Panic Disorder and personal, familial and socially incongruous sexual behavior.
[…]
Put together, these disorders in conjunction with a moralistic upbringing and an accompanying life-long pattern of self-abnegation, need for approval and service to others greatly restricted Mr. McCoy's ability to flexibly deal with the troubled marital situation that arose in his life.
[…]
Under the strain of this increasing psychological and physical deprivation of his marital situation Mr. McCoy's psychological stability began to deteriorate.

(Exhibit EE).

While these circumstances do not excuse the instant offense, they help to explain how a person who has so many good qualities can make the error in judgment Mr. McCoy made. Looking back, he is thankful that he has gained the perspective necessary to address his psychiatric disorders and that he continued with a very lengthy regiment of therapy that resulted in his successful rehabilitation. While Mr. McCoy lost a career he cherished, it has caused him to take important steps to improve his life and contribute constructively to his family and community.

### III. Remaining Factors of 18 U.S.C. § 3553(a)

a. *The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, to Provide Just Punishment for the Offense, and to Avoid Unwarranted Sentence Disparities (§ 3553(a)(2)&(6))*

Mr. McCoy's offense does not define the person being sentenced, and certainly is at odds with his life-long history of positive contributions. He has proven his value to a community of people that continues to support him.

Mark Williams writes:

> From interviewing Chris and his extended family, it was clear to me that Chris is a kind, compassionate and giving soul. He is known in his community as someone who always lends a helping hand. He is an active volunteer and has maintained close friendships since he was a youngster. The same demeanor he is known for in his personal life carried over to his time as a police officer. His peers whom I spoke at length to about Chris all said that he was first and foremost a giving person and that he wore his badge that way each and every day on the force.

(Exhibit DD).

According to Timothy Skretch, who has known Mr. McCoy for nearly 35 years: "Christopher has been a reliable and trustworthy friend for the entirety of my life. […] [He] has always been there for me in my time of need, and I have only known him to be a trustworthy and dependable individual. […] He has dedicated nearly a decade and half at this point to helping the residents of Suffolk County. […] I truly believe the mistakes he has made are an aberration and not in the character of the man I know." (Exhibit FF).

Philip Campisi describes Mr. McCoy as "extremely kind, respectful, dependable and well regarded among his peers." (Exhibit GG). Amanda Mulderig similarly describes Mr. McCoy as "a hardworking and self-less person. He is always willing to assist anyone in need." (Exhibit HH). To John Simich, Mr. McCoy "is a model citizen that exhibits great integrity and honesty. […] He is a great friend, loving father, devoted husband and dedicated police officer." (Exhibit II). And, according to Daniel Capestany, Mr. McCoy is "loyal, protective and supportive. He would always help a friend in need […]." (Exhibit JJ). He is simply, as Eric LaBarge put it, "a kind soul." (Exhibit KK).

The consistent themes woven throughout the various letters of support highlight Mr. McCoy's kindness, his empathy, his generosity, and his loyalty. These family and community members are but a fraction of the people who support Mr. McCoy.[1]

Lastly, Mr. McCoy has suffered many devastating collateral consequences. He and his family have suffered through the public humiliation of his arrest and the constant media attention to his case. Classmates at his children's schools have commented to Mr. McCoy's children about their father's case, and in some instances parents have been unwilling to let their children play at the McCoys' home. He also has suffered a criminal conviction that will forever prevent him from returning to the career that he loved and in which he spent more than 15 years.

*b. General & Specific Deterrence*

The available empirical data does not support a finding that lengthy incarceration leads to increased deterrent effects. *See* Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence.").

While we appreciate the need for general deterrence, it appears to be primarily in the certainty of punishment, not its severity, that deterrent power lies. *See* Steven N. Durlauf &

---

[1] Additional letters not quoted herein are attached as Exhibit MM.

Daniel S. Negin, *Imprisonment and Crime: Can Both be Reduced?,* 10 Criminology & Pub. Pol'y 13, 37 (2011); *See* Valerie Wright, Sentencing Project, *Deterrence in Criminal Justice: Evaluating Certainty v. Severity of Punishment* 8 (2010), *available at* http://www.sentencingproject.org/doc/Deterrence%20Briefing%20.pdf.

Studies show that the same is true of specific deterrence; there is little apparent correlation between recidivism and a lengthy term of imprisonment. *See* David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33Criminology 587 (1995)(finding no difference in deterrence for white collar offenders between probation and imprisonment); Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame").

In fact, it appears that among low-risk offenders, recidivism may, to a limited extent, be fostered, not prevented, by lengthy imprisonment. *See* Valerie Wright, *supra.*

> Among low-risk offenders, those who spent less time in prison were 4% less likely to recidivate than low-risk offenders who served longer sentences. Thus, when prison sentences are relatively short, offenders are more likely to maintain their ties to family, employers, and their community, all of which promote successful reentry into society. Conversely, when prisoners serve longer sentences they are more likely to become institutionalized, lose pro-social contacts in the community, and become removed from legitimate opportunities, all of which promote recidivism.

Wright, *supra,* at 7.

Mr. McCoy is a low-risk offender. Social science research indicates low recidivism rates for offenders like Mr. McCoy with no prior criminal history. In 2004, the United States Sentencing Commission ("U.S.S.C.") issued a report as part of its research series on the recidivism of federal guidelines offenders entitled: *Recidivism and the 'First Offender": A component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate*, United States Sentencing Commission, May 2004. (*See* Exhibit LL). In its report, the U.S.S.C. notes:

> The 'first offender' philosophy in sentencing policy generally encourages lower sentences for offenders who have little or no prior criminal conduct. This philosophy, which can be derived directly from the guidelines' Chapter Four introductory commentary, postulates that first offenders are less culpable and less likely to re-offend. As such, they are deserving of reduced punishment.

(Exhibit LL, p. 1); *see also* 28 U.S.C. § 994(j).

The U.S.S.C. found that offenders with zero criminal history points have a recidivism rate of only 11.7% (compared with a recidivism rate of 22.6% for offenders with one criminal history point, and 36.5% for offenders with two or more criminal history points). (*See* Exhibit LL, p. 13-14, 26).

More specifically, among the category of offenders with zero criminal history points, those offenders who have never been arrested have the lowest recidivism rate at only 6.8% (compared with a recidivism rate of 17.2% for offenders with a history of arrest but no conviction, and 8.8% for offenders with a history of arrest and conviction for only "never-count" offenses specified under §4A1.2(c)(2)). (*See* Exhibit LL, p. 14, 26).

The U.S.S.C. notes:

> Its low recidivism rate makes first offender group A stand out.
> Recall that group A offenders have no prior criminal events, not
> even a prior arrest.

(Exhibit LL, p. 14).

Mr. McCoy falls squarely within offender group A; prior to this case, he had never before been arrested, or had any interaction with the criminal justice system. Far from it, he served his community admirably as both a NYPD and Suffolk County police officer. And since his arrest 24 months ago, Mr. McCoy has remained in full compliance with all of the conditions of his release. Absent this terrible error in judgment, he has lived a thoroughly law abiding life underscored by hard work and sacrifice for others. And he has learned a very difficult lesson from this experience and will carry it with him for the remainder of his life.

For a variety of reasons, including Mr. McCoy's personal history, the positive steps he has already taken in therapy over the last two years while on strict pretrial supervision, and the support he will have from a large community of family and friends, I do not believe that Mr. McCoy presents any danger of reoffending.

Mark Williams, LCSW, and John Docherty, MD, also believe that Mr. McCoy does not present a danger of re-offending. According to Mr. Williams:

> From my clinical perspective, I believe that through proper
> treatment and counseling, Chris can gain greater insight and
> appropriate control of his impulse-control disorder and related
> anxiety. I am deeply encouraged that Chris has already taken
> measures to address these deep-seeded issues, by engaging in
> counseling with a psychologist both individually and for couples
> therapy with his spouse and by committing to a structured program
> of recovery by attending 2 – 3 12-Step *SAA* (Sex Addicts
> Anonymous) meetings per week.
> […]
> I believe in Chris' prospects for rehabilitation, to lead a positive,
> meaningful and purpose driven life as long as he stays committed
> to living a life free from sexual addiction. I am encouraged by
> Chris' honesty and remorse and his desire to change and develop

greater psychological strength and self-awareness concerning his behavior.

(Exhibit DD).

Dr. Docherty similarly concludes:

It is my opinion that Mr. McCoy can be successfully treated in a plan of care that addresses his Panic Disorder, his OCD and OCPD and which aids him in learning more useful and adaptive ways to deal with close interpersonal conflict. It is further my opinion that the behavior of the instant offense was circumstantial in nature and that the aftermath of that behavior and the recognition of its situational genesis makes it highly unlikely that any such behavior will recur. In addition, on a standard measure of recidivism, the Ohio Risk Adjustment System (ORAS), Mr. McCoy scores a zero and is in the category with the lowest risk of recidivism. Moreover, in the pre-sentence evaluation module of the ORAS Mr. McCoy scores a zero which is associated with no risk of recidivism.

Since my original impressions and opinions, I have taken the opportunity to consult Mr. McCoy and to review this matter. Mr. McCoy had continued mental health treatment with Dr. Goldfarb, PhD. Such treatment consisted of one-on-one therapy sessions that lasted approximately 16 months. The treatment has since terminated, as a medical decision was made that no further treatment was necessary. Since Mr. McCoy's arrest, he has not exhibited any negative behavior. On the contrary, with the help of treatment and the continued support of his family, Mr. McCoy has successfully addressed his condition and has succeeded in rehabilitating himself. As Mr. McCoy explained to me, he "addressed [his] feelings head-on and [is] confident that [he] will continue to be productive in [his] marriage and in our community." It appears that the arrest and prosecution afforded Mr. McCoy the chance to get the help he needed. In conclusion, it is my sincere belief that Mr. McCoy poses no risk of recidivism.

(Exhibit EE).

Therefore, as demonstrated by the above reports, the nearly **50** letters of support, his lifetime of positive works, and his spotless record over the past 24 months, Mr. McCoy has proved that he is worthy of redemption. He has begun to take the steps necessary to implement important changes in his life and is already well on his way to becoming a better man.

## IV.  Conclusion

On behalf of Mr. McCoy and his family, I thank the Court for taking the time to consider our sentencing submission.  We look forward to addressing the Court on July 18, 2019.

Dated:          New York, New York
                July 3, 2019

                                              Respectfully submitted,


                                              /s/ *Edward V. Sapone*
                                              Edward V. Sapone
                                              Counsel for Defendant
                                              Christopher McCoy

cc:             A.U.S.A. Lara Gatz