FILED
CLERK

9:22 am, Nov 01, 2019

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X **Docket#**
UNITED STATES OF AMERICA,    : 18-cr-00530-GRB-1
                             :
     - versus -              : U.S. Courthouse
                             : Central Islip, New York
                             :
CHRISTOPHER MCCOY,           : July 25, 2019
               Defendant     : 11:00 AM
------------------------------X

TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
BEFORE THE HONORABLE GARY R. BROWN
UNITED STATES MAGISTRATE JUDGE

**A   P   P   E   A   R   A   N   C   E   S:**


**For the Government**:          **Richard P. Donoghue, Esq.**
                                 United States Attorney

                          BY:    **Lara Treinis Gatz, Esq.**
                                 Assistant U.S. Attorney
                                 100 Federal Plaza
                                 Central Islip, NY 11722

**For the Defendant**:           **Edward V. Sapone, Esq.**
                                 **William S. Petrillo, Esq.**
                                 Sapone & Petrillo, LLP
                                 One Penn Plaza
                                 Suite 5315
                                 New York, NY 10019


**Transcription Service**:       **Transcriptions Plus II, Inc.**
                                 61 Beatrice Avenue
                                 West Islip, New York 11795
                                 laferrara44@gmail.com

Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

Proceedings

1          THE CLERK:  Calling Case 18-cr-530, United

2    States of America v. Christopher McCoy.

3          Counsel, please state your appearance for the

4    record.

5          MS. GATZ:  Good morning, your Honor.

6          Lara Treinis Gatz for the United States.

7          THE COURT:  Good morning, Ms. Gatz.

8          MR. SAPONE:  And good morning, your Honor.

9          Edward Sapone, and my partner, William Petrillo

10   for Christopher McCoy, ready for sentencing.

11         THE COURT:  All right.  Everyone's ready to

12   proceed?

13         MR. SAPONE:  Yes.

14         THE COURT:  Okay.  I have a few preliminary

15   questions before we get to it.  The first of which is

16   this, at the plea, which I recall quite well, we had a

17   long discussion about whether or not the defendant needed

18   to register as a sex offender.  It was in the plea

19   agreement, and then I believe during the plea, we agreed

20   to pull it out because counsel thought no.

21         MR. SAPONE:  Yes.

22         THE COURT:  It looks like that might not be the

23   case.  In other words, the probation department thinks

24   that registration's required.

25         So I guess the best thing to ask you at this

1    moment, counsel, is based on that, would your client want

2    to withdraw his guilty plea?

3              MR. SAPONE:  So he would not, your Honor.  If I

4    could be heard on this issue, I would appreciate it.

5              THE COURT:  Help yourself.

6              MR. SAPONE:  Sure.  So it's our understanding

7    that there is no analogous statute in New York State, and

8    so as long as Mr. McCoy remains in New York State,

9    there's no registration under SONAR, because there's no

10   analogous statute. We believe that.

11             We've checked into that, probation looked into

12   it, and so did we, and that's the state of affairs.  The

13   question is, we were just, and we were just discussing it

14   in the hallway, let's say Mr. McCoy moves, he moves to

15   Massachusetts, for argument's sake --

16             THE COURT:  Uh-hum.

17             MR. SAPONE:  -- then what we're suggesting is

18   he lets that jurisdiction know about the conviction, and

19   let's them weigh in on whether or not they think he

20   should be registered.  And I think that's where the

21   parties are at  on this issue.

22             THE COURT:  Ms. Gatz?

23             MS. GATZ:  Your Honor, I'm going to ask Ms.

24   Langone speak to that.  She's researched this pretty

25   thoroughly, and I think she can explain to the Court

1    what's going to happen via statute in New York, and --

2              THE COURT:  Ms. Langone?

3              MS. GATZ:  -- which I think is of primary

4    concern to the Court.

5              THE COURT:  You can sit.  Use the mic because

6    we're making a record.

7              MS. LANGONE:  Okay.  Yes.  So there is the

8    federal SONAR guidelines, the statute that requires that

9    individuals with certain convictions notify the states in

10   which they reside, and let the state determine.  There is

11   not currently a federal registry.  So it's left to each

12   state to determine whether or not a conviction requires

13   registration in that state.

14             Under the federal SONAR, the conduct falls

15   under a conviction that would require him to make that

16   notification to the State.  So in New York State, we will

17   send the notification of the conviction while he is on

18   supervised release.  However, there is not a statute in

19   New York State that is analogous to the offense of

20   conviction, so more than likely, New York State is going

21   to notify us that this is not registerable in New York

22   State.

23             However, each state has their own list of

24   offenses, and should he decide to move, because of that

25   federal SONAR, he will be required to notify the

Proceedings

1   jurisdiction where he resides, and let them determine if

2   in their jurisdiction, it is a registerable offense.

3           THE COURT:  Okay.  I am hearing something else

4   here, too, which may be I don't think this is my

5   determination to make, but I don't want your client

6   walking away with the impression that there's been some

7   decision that he doesn't have to register.  It sounds to

8   me like someone else will make that decision, this state

9   or another state, right?  I want him to be clear that a

10  collateral consequence, and it's a serious consequence,

11  of this plea and conviction, may be registration, so I am

12  going to offer you the opportunity once again, to

13  withdraw the plea if that's what you want.

14          MR. SAPONE:  So we respectfully decline that

15  offer, and I think we're on the same page, your Honor.

16          THE COURT:  Okay.  Just so long as he is clear.

17          MR. SAPONE:  Thank you.

18          THE COURT:  Because it's a serious matter.  I

19  don't want him walking away with the wrong impression.

20          MR. SAPONE:  Yes.

21          THE COURT:  Okay.

22          MR. SAPONE:  We appreciate it, your Honor.

23  Thank you.

24          THE COURT:  Okay.  And while I will address

25  this later in the proceeding, I have a preliminary issue

Proceedings

1   regarding restitution.  My understanding is that the

2   victim did not file a registration -- a victim impact

3   statement, but may have filed a civil action, if I read

4   that correctly.

5            Ms. Gatz, where are on that?

6            MS. GATZ:  Your Honor, victim notification was

7   made as required.  The victim has declined to participate

8   in today's proceedings, and has not submitted, as I

9   understand it, a victim notification to -- excuse me, a

10  victim statement to the probation department or the

11  Court.

12           THE COURT:  So probation advises I could

13  schedule a restitution hearing later, but there's a

14  Second Circuit case from 1994, the last century, not

15  recent, but it says you can't do that.  You have to do it

16  at the time.

17           MS. GATZ:  We're not pursuing restitution in

18  this matter, your Honor.

19           THE COURT:  Okay.  So there's no sort of

20  presumptive number, there's nothing like I'm just going

21  to leave that alone, yes?

22           MS. GATZ:  No, your Honor.  That's correct.

23           THE COURT:  Do you agree?

24           MR. SAPONE:  We agree.  Thank you.

25           THE COURT:  All right.  I mean, restitution is

Proceedings

1  mandatory but since I have no information on that, I

2  cannot make a determination.

3        MR. SAPONE:  Correct.

4        THE COURT:  Okay.

5        MR. SAPONE:  Thank you.

6        THE COURT:  All right.  Those are my

7  preliminary issues.  Let's get started.

8        First of all, counsel, has your client

9  reviewed, and discussed the pre-sentence report?

10        MR. SAPONE:  We have, your Honor.

11        THE COURT:  All right.  Mr. McCoy, is that

12  right?

13        THE DEFENDANT:  Yes, sir.

14        THE COURT:  Any other questions?  Any other

15  issues we need to resolve about that fact, in other

16  words, that you had ample time to talk about it?

17        MR. SAPONE:  We've had ample time, and there

18  are no issues, your Honor.

19        THE COURT:  Good.  Are there any issues in

20  dispute concerning the sentencing guidelines?

21        MR. SAPONE:  No, your Honor.

22        THE COURT:  So the guidelines range is if I am

23  recalling, I don't have it in front of me, 29.  We're

24  agreed on that?

25        MR. SAPONE:  One moment, your Honor.

Proceedings

1          THE COURT:  I know it's criminal history
2   category one, but I just want to make sure I've got the
3   right number.
4          MR. SAPONE:  Yes, and that's after acceptance,
5   your Honor.
6          THE COURT:  Right.  So for --
7          MR. SAPONE:  29, CHC 1.
8          THE COURT:  Right.  No other factual issues
9   need to be resolved regarding that.  We're agreed it's a
10  29 at level 1.
11         MR. SAPONE:  Correct.
12         THE COURT:  And that suggests a guidelines
13  range of 87 to 108 months.
14         MR. SAPONE:  Yes, so in a post-Booker world,
15  the advisory guidelines range is that this is a
16  misdemeanor with a one-year cap.
17         THE COURT:  Okay.  Got it.  Any other legal
18  issues relating to the sentence that we need to discuss?
19         MS. GATZ:  No, your Honor.
20         MR. SAPONE:  No, your Honor.
21         THE COURT:  Okay.  So I am going to agree then
22  with the probation department's determination that and
23  with the consent of the parties, that it is a level 29,
24  with an 87 to 108 advisory range.  So counsel, I have
25  reviewed the significant submission you made, right?  I

1 think it's 108 pages, if I have that right, something

2 like that.

3          MR. SAPONE:  You know, we're not lost for

4 words, your Honor.

5          THE COURT:  No, no, no, I got you.  There's a

6 lot of letters.  It's -- I read everything.  What would

7 like to do now?

8          MR. SAPONE:  So I would like to be brief, if I

9 may, and I appreciate that your Honor took the time to

10 read all that.

11          I am -- we are struck by the volume of letters.

12 They speak to Mr. McCoy's history and characteristics

13 quite well, much better than counsel ever could.  I just

14 wanted to sort of reiterate that we sentence people, not

15 crimes.  We sentence not just people, but the whole

16 person.  Mr. McCoy, I would like to state publicly, has

17 been an excellent father to his three children, ages 9,

18 7, and 5.

19          I was touched by the fact that he was a

20 chaperone at many school trips, volunteered at the

21 school, coached T-ball and when the kids got older,

22 Little League.  Drew little pictures for them when they

23 went to school in the morning; just an excellent father.

24          We obviously are well aware of the misconduct,

25 and never to be condoned, but again, we look at the whole

Proceedings

1  person and just very briefly would like to mention that

2  for more than ten years, aside from the instant offense,

3  did honorably serve our community.  He made more than 250

4  good arrests, and received numerous awards and

5  commendations.

6          I'll end with this, your Honor, and I'm

7  thinking about United States v. Gall, where Mr. Gall had

8  engaged in what the Court -- the U.S. Supreme Court

9  described as self-rehabilitation.  That is, no court had

10 ordered Mr. Gall to do anything, and on his own, he

11 sought to rehabilitate himself.  And here, Mr. McCoy has

12 done similarly.

13         He went to numerous doctors, mental health

14 professionals on his own.  He sought and received

15 treatment.  Your Honor saw the reports from, I think it

16 was Dr. John Dougherty, as well as licensed clinical

17 social worker, Mark Williams.  There are numerous quotes

18 in the memorandum about that.

19         And so I appreciate your time.  I'm here for

20 any questions but I think we'll, at this point, rest on

21 our submission.

22         THE COURT:  And counsel, it's a fine

23 submission.  I mean this is a difficult case.  It's a

24 little puzzling to me to get so many letters given the

25 nature of the conduct, right, but getting letters from

Proceedings

1  friends, and spouse, and family -- well, not spouse,

2  family, colleagues, others, acquaintances of fellow

3  officers, attesting to his good character.

4          How do I reconcile that with what happened,

5  right?

6          MR. SAPONE:  Because I think that -- and this

7  is a movie I might've seen a decade ago, and in the movie

8  it said, I don't know if it was Shawshank Redemption, not

9  to draw any parallels between this case and that,

10  sometimes good people do not so good things.  I think

11  that we are complex and a man could be in his middle age,

12  right, a middle-aged man in his middle years, and live a

13  lifetime of good work, and hard work, and be a great

14  father, and love his family, many of whom are here in

15  court, his Dad, his brothers, and then there's a hiccup

16  in life, and there's misconduct, and you scratch your

17  head, and you wonder how, why, how could that have

18  happened?  Sometimes there are answers, and sometimes

19  there are not.

20          But a man is not defined by his mistakes.  I

21  would like to think that we could look at the whole

22  person, and so those people are not wrong when they say

23  the things they say about Christopher because he is all

24  those things, and more, notwithstanding the misconduct.

25          THE COURT:  Yes.  I don't want to get into too

1  many details about his sort of mental health history, and

2  so forth, except to say that one of the elements that the

3  licensed social worker presented in the report is lying

4  to friends and colleagues about sexual activity, so --

5  and keeping -- what was the phrase -- keeps the secret

6  from all the world, right?

7          MR. SAPONE:  Yes, so perhaps --

8          THE COURT:  It kind of helps me understand why

9  I'm getting lots of fine, you know, attestations about

10  his good character from people whom he presumably told

11  none about any of this, fair?

12          MR. SAPONE:  Yes, your Honor.  It is, and

13  you're correct to pick up on that, and what I would say

14  is if people in the community who have a problem,

15  whatever it may be --

16          THE COURT:  Right.

17          MR. SAPONE:  -- it could be an addiction, it

18  could be a mental health issue, it could be anything, if

19  they turn to their friends and family, and say hey, I'm

20  in a bad way, all right, I'm in a dark place, I need

21  help, then maybe we'd all be all the better for it.  But

22  unfortunately, usually attendant to the problem is the

23  masking, and they're not stepping forward, and seeking

24  the help they need before the act was committed.  If they

25  had done that, we wouldn't be here, and perhaps Mr.

Proceedings

1  Petrillo and I wouldn't have a job.

2          THE COURT:  Got it.  And then the other

3  question that the social worker report raises in my mind,

4  is one of the causal factors that are identified is the

5  flirtatious behavior of the complainant.

6          Now I don't know of any evidence of that.  Is

7  there evidence of that?

8          MR. SAPONE:  So your Honor, I -- you know,

9  there's a phrase in our business, "blaming the victim",

10  and --

11          THE COURT:  Yeah.

12          MR. SAPONE:  -- my law firm doesn't do that.  I

13  also don't micro manage mental health expert's reports.

14          THE COURT:  I hear you.

15          MR. SAPONE:  And so, you know, the expert wrote

16  what he wrote.  That's not my statement.  That's not Mr.

17  Petrillo's statement.

18          THE COURT:  Well, that second part is

19  problematic, right, because this report is based on

20  comprehensive interviewing of a -- he calls him Chris all

21  the time, he uses his first name for mental health

22  reasons that are -- allude me, but I have to believe that

23  that information came from your client because there's no

24  other source for it.  Isn't that fair?

25          MR. SAPONE:  You know, I don't know what Mr.

Proceedings

1  Williams did in his extensive investigation.  I know he

2  spoke not only to Christopher but to many family members,

3  you know?  Mark Williams doesn't just speak to the

4  defendant.  He goes out there.  He pulls news articles.

5  I don't know what he did, your Honor, but --

6          THE COURT:  All right, so --

7          MR. SAPONE:  -- counsel is not making that

8  statement.

9          THE COURT:  Does this rise to the level of

10 diminished capacity, I guess is my question?

11         MR. SAPONE:  No, it does not.

12         THE COURT:  Okay.  Is there a ground, and you

13 were very careful properly to say that they're advisory

14 guidelines but is there -- so but we used to call it a

15 departure, is there a departure ground here?

16         MR. SAPONE:  No, and so you know my

17 understanding of modern day sentencing goes something

18 like this.  We calculate the appropriate sentencing

19 guidelines.  Those guidelines are merely advisory.  The

20 Court takes a look at those guidelines, and then

21 determines a sentence that meets the parsimony clause,

22 that is a sentence that is sufficient, but not greater

23 than necessary to achieve the goals of sentencing as set

24 forth in 18 USC Section 3553(a)(2), and sentences within

25 the statutory minimum and maximum, calculating those

 1    guidelines, looking at the seven factors of 3553(a).

 2              Here, the statutory mandatory minimum is zero.

 3    The maximum is one year.

 4              THE COURT:  Uh-hum.

 5              MR. SAPONE:  And so the guidelines, in effect,

 6    are one year because that's the statutory max.

 7              THE COURT:  Right, of course, but the question

 8    I have for you, are you asking for something less than

 9    that because I thought the agreement --

10              MR. SAPONE:  The plea agreement would preclude

11    that, and I respect Ms. Gatz.

12              THE COURT:  Okay.

13              MR. SAPONE:  We've had many cases together.  I

14    respect her professionalism.

15              THE COURT:  Okay.

16              MR. SAPONE:  I would never do such a thing.

17              THE COURT:  Okay.  All right.  Thank you.

18              MR. SAPONE:  Yes.

19              THE COURT:  All right, then.  I'm obviously

20    considering all the 3553(a) factors, including the

21    guidelines in reaching a conclusion here.  Are there any

22    other comments you would like to make on behalf of the

23    defendant?

24              MR. SAPONE:  So your Honor the other issue is

25    whether or not the defendant would like to make a

1 statement.

2            THE COURT:  I will get there in a second, but

3 yeah, sure.

4            MR. SAPONE:  Here -- yes, your Honor -- here,

5 it's my understanding as you correctly point out, that

6 the claimant is suing the municipality, and so on the

7 advice of counsel, given that lawsuit, with your

8 permission, he's going to respectfully remain silent at

9 this point.

10            There are some housekeeping issues, which I

11 think I will reserve for the end.  So for now, in terms

12 of argument at sentencing, we're not.

13            THE COURT:  Okay.  Mr. McCoy, I just want to

14 make sure that you're clear on the fact that you're free

15 to speak to me now if you would like.

16            You understand that, yes?

17            THE DEFENDANT:  Yes, your Honor.  Yes.

18            THE COURT:  But you would rather pass, and

19 that's okay if you want to pass but it's up to you.

20            THE DEFENDANT:  Yes, your Honor.

21            THE COURT:  Okay.  All right.  Ms. Gatz, any

22 comments would you like to make before I impose sentence?

23            MS. GATZ:  Yes, your Honor.  Obviously, you've

24 read all of the papers and you're very familiar with this

25 case, and you understand this is complex, and a

Proceedings

1   complicated case.  A simple set of facts, so-to-speak,

2   but a complicated case nonetheless.

3           The defendant was originally charged with a

4   felony, which I think bears some discussion here, and I

5   want the Court to understand that the victim's

6   credibility had no play in the decision to offer a

7   misdemeanor in this matter.  It was a legal decision, not

8   a factual decision.  And the legal decision was because

9   the traditional definition of force that is used in these

10  types of cases, this is a civil rights case, and it's a

11  deprivation of a victim's civil rights, meaning the

12  rights would be free from unwanted sexual contact.

13          In a case like this, the way to prove force is

14  beyond a reasonable doubt to a jury, the facts here,

15  coupled with the law, did not rise to that level, and I

16  think it's important to understand that.

17          This is a case of a disparate power dynamic

18  between two people.  This is case in which the defendant

19  used his authority to get the victim alone into a

20  particular location.

21          And even in a power dynamic, the victim in this

22  case felt pressured, and felt she had no other choice but

23  to engage in the sexual contact.

24          And I believe the Court hit the nail on the

25  head in terms of the expert reports, too.  It was that

1 certainly the expert report of Mr. Williams did blame the

2 victim, describing her as flirtatious, and basically

3 indicating that the defendant "resist sexual temptation".

4 And I don't blame the defendant for that because I have

5 no understanding or reason to believe that he's the one

6 that presented those facts. I don't know where they came

7 from but I certainly object to their use, and I think

8 that the expert sorely missed the mark in this report.

9        I think from my perspective, after

10 investigating this case, I think the defendant had a

11 warped view of his encounters with people. He certainly

12 thought that this wanted this but she didn't, and I think

13 that her actions spoke to that, and he declined to

14 recognize that she did not want to do this, and he forced

15 her, and not in a traditional sense. There was no gun to

16 her head. There was no you better do this or else, there

17 was a lot of unspoken communication between a police

18 officer, and arrestee, where this woman felt she had no

19 choice but to comply with what the defendant wanted.

20        And I also -- I must say also, the other expert

21 missed the mark, too in frankly, from my view, blaming

22 his wife for her actions that somehow contributed to what

23 the defendant did, and I find that offensive as well. I

24 think both the experts missed the mark in this case. And

25 certainly that's no knock on either the defendant or

1 counsel, who have conducted themselves in a very

2 professional way, in a very complicated and important and

3 stressful, and embarrassing case.

4          So I certainly am not knocking the defendant or

5 their lawyers.  I think they've conducted themselves in a

6 very appropriate manner, given the complex, and

7 complicated case that this turned out to me.

8          I certainly think that this resolution is the

9 appropriate resolution to this matter, and I asked the

10 Court to impose a sentence that all of the parties have

11 agreed upon.

12          Can I just have one moment, your Honor?

13          THE COURT:  Sure.

14 (Pause)

15          MS. GATZ:  Nothing else, your Honor.  Thank

16 you.

17          MR. SAPONE:  Your Honor, if I may?

18          THE COURT:  Sure.

19          MR. SAPONE:  So I have no response to what Ms.

20 Gatz said at all.  I have another issue which is Joe

21 McCoy, Christopher's father, is here in court and his two

22 brothers, and they had asked me could they make some

23 brief comments to the Court, and what I said to them was

24 sometimes judges say hey, I got 50 letters, and I read a

25 voluminous sentencing memorandum, I have enough

1  information to impose sentence.  Other times, judges say

2  sure, step right up.  They had asked me to ask your Honor

3  permission, and it's up to the Court.

4          THE COURT:  If I am going to say -- answer

5  both, which is I have plenty of information but if they

6  would like to be heard, I would be pleased to hear from

7  them.  So they can step up to the podium.

8          MR. SAPONE:  Great.  And this is not a case,

9  your Honor, where I've prepared with them.  There's no Q

10  and A.  They just want to make a statement.

11          THE COURT:  Yes, yes, absolutely, please.

12          MR. SAPONE:  Okay.  And I would just ask that

13  you identify yourself for the record.

14          THE COURT:  Thank you.  Step over to the

15  podium.  There's a microphone there, and that's how we're

16  making a record, okay?

17          MR. D. MCCOY:  Yes.

18          THE COURT:  Who are you, sir?

19          MR. D. MCCOY:  I am David McCoy.

20          THE COURT:  Okay.

21          MR. D. MCCOY:  Chris' brother.  Good day, your

22  Honor.  I'm Chris' younger brother David.  Whew.  I've

23  looked up to Chris my entire life, as a role model.  He's

24  hard-working, inspirational and always been there for me

25  when I needed him.  So much so that I made him the

Proceedings

1  godfather of my son, James.

2          Through God, I look for answers to how to help

3  my brother regain some sense of normalcy in his life.

4  I've watched him suffer for over two years now, and

5  remorsefully struggle to get by day to day.  He's lost

6  friendships, families, and his career.  He will always be

7  my big brother, an outstanding father, and an honorable

8  man.

9          And I know that he will right all his wrongs,

10  and regain his life, and I ask for any leniency possible

11  for my brother, to allow him to raise his children to be

12  productive members of our society, which I know they will

13  become.

14          Chris, I love you, more now than ever.  I will

15  always have your back, and you're always going to get

16  through this with the help of your friends and family,

17  and become a better version of the great man you already

18  are.   Thank you, your Honor.

19          THE COURT:  All right.  Anyone else like to be

20  heard?

21          MR. J. MCCOY:  Good morning, your Honor.  I'm

22  Joe McCoy.  I'm Chris' oldest sibling.  Thank you for the

23  opportunity to speak on behalf of my brother, Chris.

24          Growing up in our house, Chris was always a

25  caring, happy, funny boy, always sensing when someone

Proceedings

1  could use a laugh or a hug to cheer them up.  As years

2  went by, I watched my caring, witty, little brother grow

3  into a determined, dedicated, mature, hard worker who

4  gave his all to be a successful student, athlete and

5  person.

6          I also saw that Chris was always more concerned

7  about the success of others above his own.  This was

8  evident by his four years as a walk-on on the Clemson

9  University football team.  He knew that he would never

10  see the field during a game, but gave everything to that

11  team as part of the practice squad to help them prepare.

12          In all aspects of his life, Chris has been a

13  team player, doing his best for the team, whether it be

14  his classmates, fellow police officers, or his family to

15  succeed.

16          Chris is always there to lend a hand, at

17  whether helping you move, paint a room, check in on an

18  ailing family member, but if you ask any of Chris'

19  friends, they would have similar stories of how he makes

20  time to help or care for those close to him.

21          Chris is a great uncle to his three nieces and

22  five nephews.  He always makes time to attend birthday

23  parties, and special events all over the tri-state area.

24  He patiently listens to Little League stories, and is

25  never too busy for a water balloon fight, or a backyard

Proceedings

1  obstacle course.

2          I know that my own children are devastated by

3  the thought of not having Uncle Chris around, and I

4  cannot imagine how his own children will handle it.

5  Chris is a wonderful father.  He's incredibly patient,

6  loving, and compassionate with his three children.  There

7  have been many times over the last nine years when I've

8  learned how to be a better Dad by watching my younger

9  brother Chris.

10          His children are everything to him.  He is

11  completely and totally involved in every aspect of their

12  lives, and has been since the day his oldest son was

13  born.  Hawk, Liam, and Emmy (ph.) need their father in

14  their lives, and they're better off for having him as a

15  Dad.

16          After Chris' arrest two-and-a-half years ago,

17  he could have easily become angry, and bitter, and fallen

18  apart but he didn't.  Instead, Chris did everything he

19  could to keep his family together.  He used his time

20  productively, spending as much time as possible with his

21  children and his wife, helping our parents out whenever

22  he could, and picking up whatever jobs he could to help

23  his family, whereas many men would've let this experience

24  destroy them.  Chris has truly tried to grow from this

25  experience, and I'm very proud of him.

1          I would ask the Court to take this into

2   consideration today when you sentence my brother.  Thank

3   you.

4          THE COURT:  Anyone else?

5          MR. SAPONE:  Yes, his father, your Honor.

6          MR. JOE MCCOY:   It just takes me a minute to

7   get there, your Honor.

8          THE COURT:  Take your time.

9          MR. JOE MCCOY:  Good morning, your Honor.  My

10  name is Joe McCoy.  I'm the father of Christopher,

11  Joseph, Brian, David and Katie (ph.).  Let me start by

12  saying that no father could be prouder of his children

13  than I have been.

14         Chris' actions in this particular case are a

15  complete aberration, and quite frankly, I had a hard time

16  understanding how.  Chris has always been a wonderful

17  person.  As your Honor read in the reports, he suffers

18  from OCD, and we used to joke with him about that all the

19  time.  When he went to Clemson, his classmates used to

20  pick on him by moving his pencils in different

21  directions.  They'd turn his hangars around, and it would

22  drive him crazy.

23         But he was always there for everybody.  He was

24  a great son.  I can't say more than that.  A couple of

25  years ago, I did notice something that was mentioned

1  peripherally in the report, and I would just like to

2  mention it.  Chris started having, I guess what the

3  psychologist called panic attacks.  I took him to the

4  hospital a number of times where he couldn't breathe.  He

5  was checked in overnight.  Everybody thought he was

6  having a heart attack.

7           I see from the psychiatrist's report that this

8  could be a contributing factor, and you know Chris just

9  had that particular problem.

10          But getting back to the present situation,

11  Chris has three of the greatest children that you can

12  possibly have.  I'm blessed with ten grandchildren, and

13  I'll tell you what, I love each and every one of them.

14  They're fantastic.

15          Chris' Hawk, who is 9, Liam, who is 7, and

16  Emmy, who is 5, they absolutely, positively rely on their

17  father to keep the family together, to take care of them,

18  to give them guidance.  I honestly, truthfully, your

19  Honor, under oath if you want me, state that I don't know

20  how those children will survive should Chris be

21  incarcerated or go away.

22          I am here as a plea for them, for Chris, and I

23  would just like to ask a question, it's a rhetorical

24  question obviously, and that is, how is society served by

25  incarcerating a person who has made a mistake?  This is

Proceedings

1  America.  Land where people get second chances.  Land

2  where people get opportunities.  And incarcerating Chris,

3  in my opinion, and obviously it's a biased and slanted

4  one, serves no purpose.  It hurts three innocent children

5  severely.  Chris -- and I say this as far as that

6  sentence goes -- this started in March of 2017.  For two-

7  and-a-half years Chris has suffered with the Sword of

8  Damocles banging over his head.  He's been unable to get

9  a permanent position.  He's become a day laborer to get

10  money wherever he could to help the family.

11          And you know, that -- I don't understand how

12  two-and-a-half years under this intense pressure, this

13  emotional stress, and everything else, could not be taken

14  into account by the Court as some sort of time served, if

15  you will.

16          In any event, that's what I hope, and I just

17  mention to your Honor that I wrote down the definition of

18  justice out of the legal dictionary and it says, and I

19  quote, "The proper administration of the law.  The fair

20  and equitable treatment of all individuals under the law,

21  fairness."

22          Please, your Honor, take into consideration

23  everything that was in that memorandum.  My son made a

24  huge mistake.  No getting around that.  But the entire

25  family is there to help him, and we know that Chris will

Proceedings

1  become again a valued member of society, and his

2  community.  So please take that into consideration, your

3  Honor.  Thank you.

4            THE COURT:  Thank you, sir.

5            Anything further, counsel?

6            MR. SAPONE:  No, your Honor, thank you.

7            THE COURT:  Anything further from the

8  government?

9            MS. GATZ:  Your Honor, I appreciate Mr. McCoy's

10  comments.  He's been at every court appearance and he's

11  clearly the kind of father everybody should have but to

12  answer his rhetorical question, there's two things the

13  Court should be thinking about; general deterrence,

14  sending the message to other police officers or other

15  people in this type of power disparity, you can't act

16  this way.  It doesn't matter that you're having problems.

17  It doesn't matter that you are suffering from issues.

18  You can't treat people this way.

19            And specific deterrence; the report seem to say

20  this is never going to happen again.  I don't have a

21  crystal ball.  I can't tell but I think that the idea of

22  spending time in jail is a significant deterrence to

23  future conduct by this defendant.  Thank you.

24            THE COURT:  Anything further, counsel?

25            MR. SAPONE:  Just some housekeeping matters

1    whenever the Court is ready for me.

2              THE COURT:  Have at it.

3              MR. SAPONE:  All right.  So in terms of --

4    well, I think I should wait until you're done pronouncing

5    sentence.

6              THE COURT:  Okay.

7              MR. SAPONE:  Yes.

8              THE COURT:  The pretrial or the probation

9    department gave me a sentencing recommendation.  You've

10   seen that counsel, yes?

11             MR. SAPONE:  We've talked about it in the

12   hallway, your Honor.

13             MS. GATZ:  I think we should -- if the Court --

14   probation doesn't give these to the parties unless you

15   order it, so I would appreciate if you could order that

16   now, so we could have them.

17             THE COURT:  Yeah, why don't you give them to

18   the parties?  Take a few minutes to review it.  I have --

19   okay, let me say something very clearly.  I have reviewed

20   it.  It's, I guess part of my thinking though I am not

21   specifically relying on it, but if you review it, there

22   may be a few shortcuts we can take in terms of different

23   aspects of this.  So why don't you give that to them,

24   please?

25             MS. LANGONE:  Your Honor, we would need to just

Proceedings

1   specify, do you want the parties to have the entire

2   recommendation or just the conditions that we recommended

3   be a part of the term of supervision?

4          THE COURT:  Give them the entire

5   recommendation.

6          MS. LANGONE:  The entire --

7          THE COURT:  If it's something you've given me,

8   I think they should see it.

9          MS. LANGONE:  And your Honor also, they're --

10  in reviewing for sentence today, there was one condition

11  that we would like to request that we failed to include

12  in the recommendation.  I brought the language up for

13  that condition, as well, for everyone to review.  It

14  would be that during the period of his supervision, that

15  he be subject to the computer and internet monitoring

16  program, as he contacted the victim via text messages

17  following the offense, and we have also recommended that

18  he not be permitted to contact the victim in any way.

19  This would be the manner --

20         THE COURT:  That's in the document, so that

21  that part is okay, yes?

22         MS. LANGONE:  Yes, that's all in the document.

23  The only thing that we omitted from --

24         THE COURT:  You want computer monitoring.

25         MS. LANGONE:  The computer monitoring.

Proceedings

1          THE COURT:  Okay.  Please provide the document

2    to counsel.  I'll be back momentarily, and we can proceed

3    from there.

4          MS. LANGONE:  All right.

5    (Off the record)

6          THE COURT:  We're back on.

7          Counsel, did you have sufficient time to review

8    that, and did you review it with your client?

9          MR. SAPONE:  Yes, your Honor.

10          THE COURT:  Did you have any issues as a result

11    of that document?

12          MR. SAPONE:  Yes, your Honor.

13          THE COURT:  All right.  Have at it.

14          MR. SAPONE:  All right.  So just that I am

15    clear, we didn't get advance notice of it, which is fine

16    because we did speak in the hallway.  I did read it now.

17    I went over it with Mr. McCoy.  We've had sufficient

18    time.

19          THE COURT:  Counsel, stop right there.

20          MR. SAPONE:  Yes.

21          THE COURT:  If you want an adjournment for a

22    different day or this afternoon, I will do anything you

23    want.  You tell me.

24          MR. SAPONE:  We've had plenty of time.

25          THE COURT:  Okay.

1    MR. SAPONE:  Okay.  So my view point is this,

2  your Honor, as to the computer monitoring prong of the

3  supervised release, it says here on page 4, the last

4  paragraph --

5    THE COURT:  Uh-hum.

6    MR. SAPONE:  -- "As Jane Doe was victimized in

7  the instant offense, and was then subject to text

8  messages from the defendant, referencing the sexual

9  contact, a special condition of supervision has been

10  recommended, prohibiting the defendant from contacting

11  Jane Doe in any manner."

12    We agree with that completely, and so

13  therefore, we're asking your Honor not to find it

14  necessary that in addition to that, that there's computer

15  monitoring because it's obvious to us that the reason for

16  the computer monitoring condition is because Mr. McCoy

17  contacted her by text message.

18    But to deal with that, he's not allowed to

19  contact her in a manner.  He didn't use a computer in

20  this case.  This is not a case where there's any

21  traditional misconduct, if you will, that would trigger

22  the computer monitoring.  So we think it's inappropriate

23  in this case, and it could be dealt with by the paragraph

24  I just read.  All right, so -- yes.

25    THE COURT:  Ms. Gatz?

Proceedings

1          MS. GATZ:  Your Honor, I support the probation

2   department's recommendation.  I think if they feel it's

3   necessary to supervise him for a year, I think that the

4   Court should impose that.  Thank you.

5          THE COURT:  Okay.

6          MS. LANGONE:  Your Honor?  I'm sorry, if you

7   want further explanation as to why we are --

8          THE COURT:  I'm good.

9          MS. LANGONE:  Okay.

10          THE COURT:  Thank you.

11          Go ahead.

12          MR. SAPONE:  All right.  And so there's a

13   condition here that he be polygraphed, and my only

14   concern with that is that, you know, we've had a lot of

15   experience with polygraphers, and you know it depends on

16   a lot of factors.  We think it's unreliable, and again,

17   not necessary.

18          There are plenty of conditions here -- plenty

19   of conditions to monitor him, and we don't agree with the

20   polygraph aspect of it.

21          One moment, your Honor.

22          THE COURT:  Hang on one second.  Counsel, what

23   do you say about that?

24          MS. LANGONE:  Your Honor, the polygraph in and

25   of itself is not used to form the basis of a violation.

Proceedings

1  It is a way to foster truthful communication about the

2  subject matter that's being dealt with in treatment.

3          As it was alluded to earlier, there is some

4  question as to whether or not there's a truthful account

5  of sexual conduct.  Polygraph is a means to further that

6  discussion.  And again, a violation in and of itself is

7  not brought before the Court because of a failed

8  polygraph.  More likely than not, it will lead to further

9  discussion and further communication to find out the

10 cause of the failure, which may or may not trigger a

11 violation to be considered before the Court.  Failing the

12 test alone is not the reason why we would come back

13 before the Court.

14          THE COURT:  Okay.  Anything else, counsel?

15          MR. SAPONE:  Yes, your Honor.  So on the first

16 page of the recommendation, the last paragraph --

17          THE COURT:  Uh-hum.

18          MR. SAPONE:  -- "The defendant shall not obtain

19 a position of employment which allows him to have custody

20 or control of over others, adults or minors."

21          We think that that is vague.  I don't really

22 know exactly what that means.  I think it's a case by

23 case basis as to whether or not let's say a certain

24 managerial position would equate to custody or control.

25 I think that a cleaner way to do it, your Honor, is that

Proceedings

1  he shall not be permitted to become employed as a

2  security guard or a security officer, which we would

3  consent to.

4          THE COURT:  Are we looking for law enforcement

5  there; is that the point?

6          MS. GATZ:  Yes, your Honor, but I think what --

7  I think if you want to modify it to that language, that's

8  fine but I think the idea would be to check with pretrial

9  or probation before he takes employment, and we can

10  discuss it at that point.  So that's fine to modify it in

11  that fashion, but I do think that before taking

12  employment, he's going to have to run that by his

13  probation officer --

14          THE COURT:  Okay.

15          MS. GATZ:  -- to determine the suitability of

16  the job, your Honor.

17          THE COURT:  Right.  I know, I understand.  I am

18  just running through my head, what are the variations,

19  right?  Is it if we say law enforcement or law

20  enforcement-type position, does that cover what we're

21  looking for or not really?

22          MS. GATZ:  One moment.

23  (Pause)

24          MS. GATZ:  That's fine, your Honor.

25          THE COURT:  Okay.  And of course, to the extent

Proceedings

1  that that condition applies, the probation department is

2  not stopped from bringing anything forward to the Court

3  that may -- that we're not thinking of today, right?  In

4  other words, we got this kind of job, and it may not be

5  great, and we can revisit it then.  Fair enough?

6          MR. SAPONE:  We can always take things up in

7  the future.

8          THE COURT:  Okay, good.  All right.

9          Anything further?

10 (Pause)

11         MR. SAPONE:  No, thank you, your Honor, and

12 thank you for all the time you've put into this.

13         THE COURT:  No, problem.

14         Ms. Gatz, anything else?

15         MS. GATZ:  No, your Honor, thank you.

16         THE COURT:  All right.  Then I am ready to

17 impose sentence.  Like every criminal case, this case is

18 tragedy for everyone involved.  The conduct was

19 reprehensible.  The impact on the families -- on the

20 victim was unimaginable.  The impact on this defendant's

21 family, extended family, some who are here today, is

22 terrible, but that's always the case.

23         So I am going to talk about the -- what I've

24 considered in connection with the -- let's start with the

25 period of incarceration.  So counsel raised a lot of

Proceedings

1  issues concerning the defendant's state of mind,

2  background, character.  I've considered all of those

3  things.

4          If this were a case where the pending charge

5  were a felony, the decision would be much more difficult.

6  However, in this case, the guidelines do represent

7  something the Court must consider, and I think are a fair

8  starting point.

9          Is this a case that would warrant a departure

10  from the guidelines?  No.  Would it warrant a variance, I

11  think that's the new phrase, from the guidelines?  Maybe.

12  But what I can be certain of is it certainly wouldn't

13  warrant a variance that would go below the statutory

14  maximum of this case.  So in other words, we're not going

15  to reduce him from 87 to something less than 12 months.

16          So I find that a one-year period of

17  incarceration is appropriate, in considering all of the

18  factors under 3553(a).  I believe that is sufficient,

19  though not beyond the requirements of that section.  It

20  is not greater than what is required to specifically --

21  particularly achieve specific and general deterrence

22  here.

23          That will be followed by one year of supervised

24  release, and that period will be governed by the

25  conditions contained in the probation department's

Proceedings

1  recommendation with the exception of the computer

2  monitoring.  I agree with counsel that the situation here

3  does not warrant computer monitoring. I think it's for a

4  different type of situation and case, but I do agree with

5  probation that polygraphy may be an appropriate tool in

6  this case, particularly given the level of deceit that

7  went on, including right up to the time of, I think,

8  deceit with his treatment therapist, and so forth.

9       I am not imposing restitution because there is

10 no victim impact statement here.  Of course, that will be

11 without prejudice to the victim pursuing whatever rights

12 she may or may not have in parallel civil proceedings.

13      I am not imposing a fine due to the -- due to

14 many factors, but including the defendant's obligations

15 to his young children, which the family has brought to my

16 attention, and so I think any spare income he has will be

17 used for those obligations.

18      There's a $25 special assessment that must be

19 imposed at this time.  And we will alter the language of

20 the position of employment issue to cover law enforcement

21 or law enforcement-type positions, as well as the fact

22 that probation can bring any other issue -- jobs that may

23 be an issue to the attention of the Court.

24      Is there anything I neglected to cover?

25      MS. GATZ:  No, your Honor.

Proceedings

1          THE COURT:  Counsel?

2          MR. SAPONE:  No, your Honor.  But if I may at

3  this time, ask your Honor that Mr. McCoy be -- that your

4  Honor recommend FCI-Otisville has a camp, and the reason

5  I am asking for that recommendation, it's not binding on

6  the BOP, but they appreciate Court's recommendations, is

7  it's the only facility that's close enough where he might

8  be able to see his three children.  If he's designated

9  anywhere else, his wife will not take the children to see

10  him.  And so they would be deprived of a very, very

11  strong relationship with their father, who is the one

12  that wakes them up in the morning, puts them to bed at

13  night.  It's going to be very traumatic to begin with.

14          I don't want to see a situation where he

15  doesn't see them for a year.  So my request is that your

16  Honor recommend the camp at FCI-Otisville.

17          And the next thing, and last thing, your Honor,

18  is that he be permitted to self-surrender to whatever

19  facility the BOP designates him to, anytime after October

20  18th, and that's because the children are going to start

21  school, and he wants to be there just for the beginning,

22  to get them, you know, ingrained in the school year, and

23  then right after that, he's willing to drive himself or

24  his wife or father will drive him directly to the

25  facility.

Proceedings

1          MS. GATZ:  No objection to any of those

2   requests.

3          THE COURT:  Okay.  So I will recommend FCI-

4   Otisville, recognizing, of course, that it's not binding

5   on the Bureau of Prisons, but I will recommend that in

6   light of the defendant's strong family ties, and he will

7   self-surrender then sometime on -- on or after October

8   18th.

9          MR. SAPONE:  So it would be on or after October

10  19th -- after October 18th, so --

11         MS. GATZ:  I think they like us to pick a date.

12  Can we say October 19th?

13         MR. SAPONE:  Which is a Saturday, so maybe we

14  could just do the 21st or --

15         THE COURT:  Okay.

16         MS. GATZ:  Monday, the 21st is fine.

17         THE COURT:  Lawyers doing math, that never goes

18  well.  Okay, October -- Monday, October 21st, he will

19  self-surrender to the designated facility.  If they have

20  not yet designated a facility, he'll surrender to the

21  marshals and take it from there.

22         MR. SAPONE:  Great.  And then your Honor, I

23  just want to be clear about something.  So your Honor --

24  and thank you, had recommended FCI-Otisville, but I know

25  that they have a camp, and a low, could your Honor

Proceedings

1  recommend the camp?  A low facility, which is a --

2          THE COURT:  What is a "low"?

3          MR. SAPONE:  So it goes --

4          THE COURT:  L-O-W, are you saying?

5          MR. SAPONE:  Yes, camp, low, medium, high

6  security.

7          THE COURT:  I don't --

8          MR. SAPONE:  And so --

9          THE COURT:  -- think I'm in a position to make

10  that call.

11          MR. SAPONE:  Okay.

12          THE COURT:  Because I don't know what those

13  things mean, so I will leave that to the Bureau of

14  Prisons.

15          MR. SAPONE:  FCI-Otisville is plenty.  Thank

16  you.

17          THE COURT:  Okay.  Good.  Now is there a waiver

18  of appeal?

19          MS. GATZ:  That's a very good question, your

20  Honor.

21          THE COURT:  Well --

22          MS. GATZ:  I believe so.  Let me just look at

23  the agreement.  I don't remember.

24  (Pause)

25          MS. GATZ:  Yes, your Honor.  The defendant

Proceedings

1 waived his right to appeal if the Court sentenced him to

2 12 months or below.

3          THE COURT:  Okay.  So sir, there is a waiver of

4 the appeal in the agreement but you should explore with

5 your attorney whether or not you would like to appeal the

6 sentence.  There may be a possibility, I never know about

7 these things, but I do know if you don't appeal within a

8 very, very limited amount of time, you will certainly

9 give up that right.

10          So you should talk to your attorney about any

11 rights you may have.

12          Anything else we should cover, for defendants?

13          MR. SAPONE:  No, and thank you, your Honor.

14          MS. GATZ:  Your Honor, does the pretrial

15 supervision continue until October 21st?

16          MS. GATZ:  Absolutely.

17          THE COURT:  Okay, thank you.  Of course.  That

18 should've gone without saying but I'm glad you said it,

19 so thank you.

20          MS. GATZ:  Thank you.

21          THE COURT:  All right.  We're adjourned.

22               (Matter concluded)

23                    -o0o-

24

25

# C E R T I F I C A T E

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **31st** day of **October**, 2019.

Linda Ferrara

AAERT CET 656

Transcriptions Plus II, Inc.